MEMORANDUM OF DECISION RE MOTION FOR TRANSFER OF GUARDIANSHIP
On November 22, 1998 after five days of trial, the court entered interim orders on the motion for revocation of guardianship brought by Tammy K.[2], seeking return of the guardianship of her seven year old son, Alexander, which had been transferred to her parents, Paul and Joan C., when Alexander was an infant. In its memorandum of decision, the court awarded Tammy unsupervised visitation with Alexander. Specifically, the court found that Tammy had rehabilitated herself and that the grounds for the original transfer of guardianship no longer existed. The court further held, that once (he moving party, Tammy K., had demonstrated her rehabilitation, the focus then shifted to whether or not it was in Alexander's best interests to transfer guardianship to his mother. For the reasons set forth in detail below, the court concludes that such a transfer is not in his best interests and therefore denies the motion. However, the court orders the specific unsupervised visitation in accordance with the detailed schedule attached.
Since its original interim decision, the court has heard an additional four days of testimony and received additional exhibits from the parties to this action. The trial concluded on May 24, 1999. From that evidence, the court finds that the unsupervised visitation between Tammy and her son has for the most part gone well. There was one early upsetting visit where Alex was alarmed by attending a birthday party during which the loud noise of popping balloons startled him. This event caused Tammy to become upset, as she had not had prior experience with Alex's sensitivity to unexpected loud noises.[3] However, what has unfortunately not improved has been the relationship between the guardian grandparents and Alexander's mother. Difficulties have continued during the periods of time that Alexander is transferred from his grandparents to his mother or returned by his mother to his grandparents. To compound the unfortunate nature of the family problems is the fact that Alexander has been witness to the hostilities since November 1998, as well as earlier events. All parties acknowledge that these events have been upsetting to Alexander.
Tammy has shown a lack of good judgment in being unable to CT Page 6558 curb her anger at her parents in the child's presence, on one occasion at the office of a psychologist selected to assist the child and the parties with the transition in his life, and on another, when she came to pick up the child at his home with her parents. On that last occasion, not only did she fail to restrain herself, but Paul and Joan C. also admitted to their inappropriate behavior during that exchange of hostilities when they told Alexander that he had to go to visitation or they would get into trouble, maybe even have to go to jail. There have been other such events between the adults
Also since the court's interim order, the grandparents have been taking Alexander to regular weekly visits with Michael Pines, a psychologist who had previously assisted the grandparents whenever they needed help with understanding how to best manage Alexander. The visits were scheduled by the psychologist for the early morning, 7:30 a.m. of the day after the midweek unsupervised visitation Tammy has had with her son. During these sessions, Alexander has gradually begun to speak to the psychologist about some issues during his visits with his mother.
What is evident from the testimony is that both Tammy K. and her parents with their angry and confrontive behavior have been sending Alexander explicit messages, messages that would make it clear to any child that they cannot get along and that each believes the other to be a negative influence on the child. Alexander has been caught in the middle. While Tammy has been more openly hostile and not hidden her feelings, the grandparents' more subtle actions unfortunately send the same negative messages. How it is both they and the psychologist could fail to understand the impact and significance to a small child of being dragged to a therapists office in the early morning before school on the day after visitation with his mother is a complete puzzle to the court. If not the grandparents, than at least the psychologist should have had enough distance from the conflict not to willing participate in further accelerating it.
In addition to the negative messages each side is sending to Alexander, both Tammy and her mother continue to cling to unrealistic and romanticized notions of what their mother-daughter relationship should be. This only increases the tension and hostilities between them. Sadly, neither is able to focus on the reality of the relationship that persists, despite all their troubles, and to build on the foundation already CT Page 6559 established. Joan C. spoke of her disappointment that Tammy was unwilling to enjoy Christmas festivities with them, exchange presents or acknowledge their anniversary. Given that the family is engaged in a war, albeit a legal one, over the next generation, namely Alex, Tammy's reaction is at least more honest and more in tune with the present reality. Tammy, on the other hand, was very disappointed, when she missed an appointment and did not answer the phone, that her mother's first thought was not that something might have happened to her, but that she was acting out yet once again by failing to carry out something she knew and had agreed to do — in this case attend a counseling session. Both mother and daughter should understand that disappointments and unrealized hopes are often part of the relationship of mothers and daughters, even those with obvious biological ties, and that as daughters grow older, their understanding of the shortcomings of their parents should increase and bring acceptance. Also, as parents watch their children become adults, the course of their children's lives can never be as they might have wished. It is their task to respect the choices made by their adult children, rather than continue to remonstrate with them as though the children were still subject to the parents' control, which both Joan and Paul C. have done to Tammy. The fact that both Joan C. and Tammy K. still care enough to make such laments and longings public is testimony to the relationship that endures. Perhaps with the ending of the legal disputes over Alex, a time will come when each can reach out to the other and build on what remains.
Paul C. remains the most critical of his daughter and cannot disguise his sense of vindication when she fails at something she has the capacity of handling properly, whether it is attending counseling sessions on time or blaming her, while professing his innocence, for the asthma with which Alex has been diagnosed. Given the stress to which both sides have subjected Alex, it is surprising that there are not more symptoms of his emotional tension and upset. While the court can understand how this blaming of her, although never explicitly stated, would anger Tammy, it is also not in Alexander's best interests to be taken by his mother to an entirely different physician and receive a different medical diagnosis. All such action does is highlight once again the vast differences between each side seeking Alexander's affections.
But the specifics of the hostilities that exist between Tammy K. and her parents do not focus on what is in the best interest CT Page 6560 of this child. As stated by his counsel, what is best for him is to be loved and to have access to both his mother and his grandparents. The question remains — how is it best for him that this joint access take place? Michael Pines, who in 1997 advocated increased access between Alex and his mother, testified in September, 1998 and in March and May, 1999 in the final phase of the trial. In his professional opinion as a licensed clinical psychologist, a transfer of guardianship of Alex to his mother and all the changes that this implies is not in Alexander's best interests. He acknowledged that he had never seen Alexander with his mother. But he stated that this child has an "anxious attachment" problem, which he traces from the difficulties of his first few years. He is clear that the grandparents are the "psychological parents" of this child, the ones he looks to provide for his daily needs and those he turns to for comfort and security. He notes that there was a "significant increase in his anxiety and insecurity most notably since the overnight visitation. Separation is problematic for him". He found that this child had a "sense of abandonment that no one else was there to meet his needs — no one else had the capabilities to look after him." This child, in his opinion, is change-adverse and thrives with predictability and routine, a predictability and routine he has with his grandparents.
Robert D. Meier, the court-appointed psychologist-evaluator, has reviewed the relationship of Tammy and her parents to Alexander a number of times since 1995, when he did not feel Tammy was yet ready to care for her son. He believes that there is now a relationship between the mother and her child and that her care of him and his interaction with her are appropriate ones. He did not believe that Tammy was a psychological parent of her child, since the had been out of her care for a long time. In his opinion, returning the child to her care on a full time basis would require Alexander to make significant adjustments. Alexander would need to be supported by therapy to guide him through the adjustment issues that would inevitably be expected to arise. As Dr. Meier testified at trial, he was glad that he did not have to make the decision of whether or not the child should be returned as he did not have a great deal of information concerning Alexander himself and had never evaluated him independently. Other than having received a 1997 letter report from Dr. Michael Pines, he had not received input from this therapist concerning Alexander. Dr. Meier does believe that Paul and Joan C. have stood in the way of the reunification of Alexander with his mother in the past and that serious CT Page 6561 reunification attempts, including unsupervised access, should have begun much earlier.
The court concludes, from the evidence, that returning Alexander to the guardianship of his mother is not in his best interests today. Since the hearing on the motion for revocation of guardianship resumed in March, 1999, there have been some significant changes in Tammy's life. On March 21, 1999 she married Muhammad K., a Pakistani national in the United States since 1991 on a work permit which lapsed due to his failure to timely renew it in September, 1998. Both he and Tammy testified that they have known each other for two years, but were romantically involved only a short period of time before their marriage. He was present in Tammy's home during the February vacation which Alexander spent with his mother. Prior to that time, Alexander did not know Muhammad.
While Tammy has stated in court that her present plans are to remain in Connecticut for one year, she has also told her parents that she and Muhammad had plans to move to the Bronx, where Muhammad had recently resided. She stated that she had the right to move where she wished and could not be restricted to the state of Connecticut. While it is the case that she may move where she wishes, her vehemence about her freedom to choose such a change does not speak well for her willingness to accommodate her life to Alex's needs. Alex, regardless of his permanent residence, requires regular and frequent contact both with his mother and his grandparents. All of the experts have testified to such contact being in Alexander's best interest. Tammy's failure to understand the importance of Alexander's close connection to his grandparents, who have provided for him since he was very young, does not bode well for how she would meet his needs, if he were placed with her. As Dr. Pines stated: "I do not believe that his mother understands his needs and is capable of placing his needs ahead of her own." The court concludes from the evidence that this is unfortunately a true statement.
In the past, Paul and Joan C. have raised the issue that Tammy has moved frequently and makes casual living arrangements. They see this as proof of her lack of stability. Tammy originally testified that she had plans to move to Groton, should Alex come to live with her on a permanent basis, and that she would enroll him in school there. After her marriage to Muhammad and her further testimony, she stated that she had not committed to these plans and at present there were no established plans for where CT Page 6562 Alex would be placed in the fall. Given Alexander's resistance to change and difficulty with any change in his routine, a school change would need to be carefully planned to ensure a smooth transition for him and to assuage his anxieties, fears and concerns. There could have been a visit to any new school and meetings with the new teachers as well as an exchange of records, had it been carefully planned prior to the close of this past school year. Tammy, however, appears not to be aware of her need to make plans in such a detailed fashion in advance of the time of the transfer. While any school system will be required to accommodate Tammy and her child, should they move into the school district even shortly before school opens, the court concludes that coping with a proposed change in this manner is not in Alexander's best interests, given his heightened anxiety and the strong support he needs to manage it
As Dr. Pines noted, Alexander does not see his mother as a complete stranger, however he "is not convinced that he sees her as a mother figure either as there is a degree of anxiety and uncertainty." He continued to note that "while she may be fun to spend a brief period of time with, he feels most secure and comfortable with his grandparents, whom he views as his safe anchor." Any change in guardianship would require a heightened awareness of Alexander's particularized needs, which, the court concludes, Tammy has not demonstrated in her most recent actions.
The court-appointed evaluator spoke to the need for both Tammy and Alex to have professional therapeutic support if Alex were to be appropriately transitioned in her home. That statement contemplated a home in which only Tammy and her son resided, and did not review or take into consideration any third person, such as Tammy's present husband, with whom Alexander does not yet have a close relationship. Making the transition from being a single unattached woman to a married woman whose partner is not only new in her life but from a culture very different from her own will require adjustments on Tammy's part as well as adjustments on her partner's part. Adding to this the additional requirements of adjusting to having Alexander on a full time basis requires significant changes for all involved, including Alexander himself. Given that the court has found this child to have increased anxiety and greater than normal stability and continuity needs, the court concludes that such added burdens of adjustment are also not in his best interests.
As the court-appointed evaluator, Dr. Meier noted, this CT Page 6563 matter is akin to a custody dispute in that each of those seeking the guardianship of Alexander is capable of providing for him. As has been stated in the dissolution context:
 "The award of custody requires the trial court to make difficult and sensitive inquires into the relationship between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interest of the child, the child's interest in sustained growth, development, well being, and the continuity and stability of its environment." Cappetta v. Cappetta, 196 Conn. 10, 16, 490 A.2d 996 (1985).
In this guardianship case, given Alexander's unique personality and issues, this language is particularly apt. The court holds that Alexander's interests in sustained growth, development, well-being, and in the continuity and stability of his environment are best met by remaining in the care of his grandparents, Paul and Joan C. The court therefore denies the motion for revocation of guardianship filed by the mother, Tammy K.
Nonetheless, the court also concludes that this child has benefited from less restrictive access to his mother. That visitation has gone as well as it had, despite the tensions in this family, is proof of his need for continued contact with his mother. Based on this child's best interests, the court enters the orders for continued visitation of Tammy K. with her son, Alexander C. as set forth in Schedule A attached hereto and detailed for the summer of 1999 in Appendix 1.
Barbara M. Quinn, Judge, Child Protection Session
 SCHEDULE A VISITATION SCHEDULE
1. Summer Holidays.
CT Page 6564
The current orders of Wednesday and alternating weekend contact will continue until Alexander has completed his current school year on June 22, 1999. Thereafter, during the summer vacation, the court notes that the grandparents have planned to take Alexander to Vermont from July 5th through July 16th, at which time they plan to return him to Tammy at noon in anticipation of a counseling session at New London Counseling Center. If there is a session for that date, then that time frame is appropriate. The court further orders, due to the extended time that Alex is expected to be in Vermont, that he is entitled to spend the weekend of June 25 through June 27 with his mother, commencing on Friday, June 25 at 5 p. m. and concluding on Sunday, June 27 at 6 p. m. The court further orders that Tammy have two non-consecutive weeks with Alexander during the summer holidays, where there will be no visitation with Paul and Joan C., except for the telephone contact ordered below. She shall notify them of the weeks she selects on or before July 16, 1999.
Upon Alexander's return from Vermont, he shall spend the weekend with his mother in New London, commencing Friday at 5 p. m. and continuing until Sunday at 6 p. m. The alternating weekend schedule shall then continue, except for the two separate weeks that Tammy is entitled to receive. In addition, Alexander shall visit with his mother every Wednesday from 10 a.m. to 6 p. m., at which time she shall return him to the home of her parents.
Alexander's birthday is on July 29, 1999. He shall spend the morning with his grandparents and shall spend from 2 P. M. on Thursday afternoon to the following Sunday at 6 p. m. with his mother, as the weekend would be her alternating weekend time.
In the summers following this one, the schedule shall continue in accordance with the outline set forth above, except that the grandparents shall be entitled to have Alexander the afternoon and evening of his birthday and his mother in the morning of that day. Each shall be entitled to two non-consecutive weeks with Alexander, free of the ordinary Wednesday and weekend visitation schedule.
2. The School Year
A. On August 30, 1999, Alexander's school session resumes. The parties shall then return to the previous visitation schedule Wednesday after school to 45 minutes before his bedtime. Also CT Page 6565 there shall be weekend visitation on alternating weekends from Friday at 6 when there is no counseling session, and earlier if there is one scheduled until Sunday at 5 P. M. When Tammy's weekend is followed by a Monday holiday, she shall be entitled to have Alexander spend that day with her, if she wishes until 5 P. M.
B. Other Holidays
Thanksgiving
In 1999, Alexander shall spend Thanksgiving with his grandparents and the balance of the time he is out of school from Friday, November 26, 1999 with his mother through Sunday, November 28. The holiday shall alternate in succeeding years between the parties in the same fashion.
Christmas.
In 1999, Tammy shall be entitled to have Alexander on Saturday morning, December 25 at 10 A. M. until Wednesday, December 29, 1999 at 5 P.M. In succeeding years, the parties shall divide the Christmas holidays so that Alexander would spend approximately one half of the vacation including New Year's Day with his mother the following year. She would be entitled to have him with her on Christmas eve until Christmas morning at 10 a.m. at which time he will be returned to his grandparents and then returned to her as above stated.
Winter and Spring School Holidays
Joan and Paul C. shall have Alexander during the winter school holiday each year and due to the planned skiing trips in Vermont, this portion of the vacation scheduled shall not alternate. Tammy shall have him during the spring vacation.
3. Miscellaneous provisions:
A. Counseling
Counseling sessions have begun for Alexander and the family at New London Counseling in New London, ordinally recommended to assist him with any planned transition to his mother's home. The court suggests that such sessions be continued, at the discretion of the parties to assist with the ongoing interfamily problems CT Page 6566 that may develop in the future for so long as such counseling is beneficial to the parties. The court further suggests that the parties be guided in their decision by the therapist and that therapist's recommendations. As previously suggested, cooperation with Michael Pines would be appropriate.
B. Telephone Contact
The court directs that the grandparents and Tammy shall be entitled to have telephone contact with Alexander while he is in the out of their care. Each shall provide the other with the relevant telephone number and guide and assist Alexander in making contact as frequently as he desires but at least twice during every week.
C. Minimal Visitation Orders.
As previously ordered, the visitation set forth above and the visitation detailed in Appendix A for the summer months are the minimal orders of contact and that, to the extent the parties can voluntarily agree to alter them, share additional time and have Alex in their homes with the others present to demonstrate their cooperation and commitment to him, each of them is encouraged to seek opportunities for such cooperation and to secure mutual agreement to any changes in the schedule. So for example, having Tammy spend time with Alexander at the grandparents family home at Christmas, as has previously happened, is such an option. Further, there will be times where the previous plans or unexpected events will necessitate changes to the established schedule. The parties are encouraged to accommodate the changes each will from time to time require and to agree to make-up or switched times for contact with Alexander.
D. Further Court Involvement
To the extent that the parties may need to return to court concerning changes in the schedule or other matters, the court hereby refers this case to the Superior Court for Family Matters in the Judicial District where Alexander may reside at such time as any issues may arise. This matter is more appropriate to the Family Session, which with the services of the Family Relations office, is better designed to provide the pre-trial and other assistance the parties may require in Alexander's best interests. While the court understands the procedural background of this matter, it is more appropriately designated a family matter and CT Page 6567 heard in that forum. The court directs that the memoranda of the court of November 22, 1998 and June 21, 1999 be made a part of the court file and remain sealed there in the best interests of the child, available to parties. their counsel and the court only.